**BRAZOS ELECTRIC POWER
COOPERATIVE, INC.,
Plaintiff-Appellant,**

v.

**SOUTHWESTERN POWER
ADMINISTRATION, et al.,
Defendants-Appellees,**

and

**Southwestern Power Resources
Association, Inc., et al.,
Intervenors-Appellees.**

No. 86–1059.

United States Court of Appeals,
Fifth Circuit.

June 18, 1987.

Robert A. Jablon, Cynthia S. Bogorad, Nancy E. Wiegers, Spiegel & McDiarmid, Washington, D.C., R. Coke Mills, Mills, Riley, Millar & Matkin, Waco, Tex., for plaintiff-appellant.

C. Max Vassanelli, Dept. of Justice, Civil Div., Washington, D.C., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for Southwestern Power Admin.

M.D. Samples, Robert P. Oliver, Worsham, Forsythe, Sampels & Wooldridge, Dallas, Tex., for Texas Utilities Elec. Co.

Clinton A. Vince, Nancy A. Wodka, Bernhardt K. Wruble, Washington, D.C., for Rayburn Country Elec. Co-op.

Ralph J. Gillis, Hingham, Mass., for Sam Rayburn Dam Elec. Co-op.

Robert D. Willis, Livingston, Tex., for Southwestern Power Resources.

William H. Burchette, Christine C. Ryan, Mark D. Nozette, Heron, Burchette, Ruckert & Rothwell, Washington, D.C., for Tex-La Elec.

Before GOLDBERG, RUBIN, and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

This appeal presents important questions affecting the allocation by the Southwestern Power Administration (SWPA) of hydroelectric power produced by certain federal water projects. SWPA is a federal power marketing agency within the Department of Energy. Plaintiff-appellant Brazos Electric Power Cooperative, Inc. performs the generating and transmission functions for a score of electric cooperatives serving consumer-members in 66 Texas counties. Brazos contends that SWPA failed to: (1) give adequate notice of proposed power allocations, (2) comply with the preference clause of the Flood Control Act of 1944 by marketing power to an investor-owned utility, (3) give adequate consideration to the application and objection of Brazos to marketing contracts, and (4) conduct an antitrust review as part of its power allocation procedures. On cross-motions for summary judgment the district court dismissed the action, concluding that SWPA complied with the notice and all other rulemaking procedures, exercised un-

reviewable discretion in making its allocation decisions and in ruling on the preference issue, and was not obliged to conduct an antitrust review. 627 F.Supp. 350 (W.D. Tex.1985). For the reasons assigned, we affirm.

### Background

SWPA markets the hydroelectric power generated at federal dams in the six-state region comprised of Arkansas, Kansas, Louisiana, Missouri, Texas, and Oklahoma. Section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s, directs SWPA, and its counterparts nationwide, to "transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles," giving preference in the sale to "public bodies and cooperatives."[1]

This case involves the hydroelectric power produced from the Whitney Dam on the Brazos River in Texas, and the Denison Dam on the Red River, which forms the boundary between Texas and Oklahoma. The Denison facility has two generating units. SWPA historically sold all power generated at the north unit into its inte-

grated system for transmission to customers outside of Texas. Power from the south unit was sold to utilities in the north central and southern parts of Texas. These customers are isolated from the interstate transmission network and serve only intrastate needs, thereby avoiding federal jurisdiction under the Federal Power Act, 16 U.S.C. § 824. In 1970 they formed the Electric Reliability Council of Texas (ERCOT). SWPA has no transmission facilities in this "noninterconnected" portion of Texas, also known as ERCOT Texas. Each customer of federal power there must arrange for the transmission, scheduling, and firming of power.

Pursuant to a 1947 agreement, SWPA sells to Texas Utilities Electric Company (TUEC) the Denison South peaking power, which is resold to SWPA's preference customers in ERCOT Texas as firm "load factor" power.[2] TUEC is an investor-owned, nonpreference utility. It receives Denison South's 35 MW of capacity and 1,200 kWh/kW of energy, with an option to receive any available "excess energy" that might result from additional rainfall.

Prior to 1971 SWPA allotted Brazos the entire output of the Whitney Dam. Begin-

---

1. The pertinent parts of 16 U.S.C. § 825s direct: Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission. Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of such power and energy shall be given to public bodies and cooperatives.

Section 302 of the Department of Energy Organization Act of 1977, 42 U.S.C. § 7152(a)(1), transferred this responsibility to the Secretary of the Department of Energy:

There are hereby transferred to, and vested in, the Secretary [of Energy] all functions of the Secretary of the Interior under section 5 of the Flood Control Act of 1944, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

\* \* \* \* \* \*

(B) The Southwestern Power Administration.

2. Federal water projects generally produce peaking power because there is not enough water available to support full-time operation of the generators at full output capacity. By providing the power at peak times, hydropower can be made useful to large customers who need extra power to supplement continuous operating plants at daily and seasonal peak times. Load factor power is power that is scheduled in accordance with a customer's particular demand for electricity. By using TUEC as a scheduling agent, smaller customers can convert the peaking power into a more useful product. Firm power has assured availability to the customer, regardless of output of a particular generating plant.

ning in 1971 SWPA guaranteed to Brazos, Whitney's 30 MW of capacity and 1,200 kWh/kW of energy annually. Because only 747 kWh/kW could be assured from the Whitney project per year, this required SWPA to guarantee or "firm up" its obligation to Brazos from other sources when necessary. Brazos initially had the right to purchase any excess Whitney energy that SWPA determined was available. In 1974 the reference to Whitney Dam was omitted from the contract because TUEC agreed to firm up SWPA's obligations to Brazos with power from Denison South. The contract also terminated Brazos' right to purchase excess Whitney energy. Instead, Brazos was entitled to only "such amounts of Excess Energy as [SWPA] in its sole judgment, determines is available for sale...." SWPA was not obligated to offer excess energy to Brazos and Brazos was not obligated to accept any excess energy offered.

In 1979, cognizant of an increasing demand for its economical product and the impending completion of two new facilities, and in anticipation of the expiration of several contracts, SWPA undertook to develop a new system for allocating power. The rulemaking procedure commenced. On August 2, 1979 SWPA published a notice of its Preliminary Power Allocations in the Federal Register, noting its intent to obtain an equitable distribution of power in its six-state region of responsibility. 44 Fed.Reg. 45,468 (1979).

In developing its proposal for allocations, SWPA considered several criteria. It proposed to: consider each customer's ability to use peaking power; allocate only in meaningful quantities; continue sales to present preference customers; distribute equitably between the states to achieve the

most widespread use; consider real hardship; and give no priorities between or among different preference customers, such as cooperatives and municipalities. 44 Fed.Reg. at 45,470 (1979).

As to the proper distribution between the states, SWPA proposed to allocate "on the basis of the distribution of the total preference customer load among the six states in the marketing area." 44 Fed.Reg. at 45,-470 (1979). In an environmental assessment included with and referred to in the notice, SWPA recognized that the ERCOT Texas allotment would likely be affected.[3]

SWPA sent notice of this proposal to each of its customers, including Brazos, and held public hearings in Baton Rouge, Louisiana; Kansas City, Missouri; and Tulsa, Oklahoma. SWPA invited and thereafter received written comments. Brazos neither attended any public hearings nor commented in writing. The total power requested by preference customers was several times greater than the energy available.

SWPA adopted its final allocation schedule based largely on its preliminary proposals, allocating power to each of the six states on the basis of the total demand of preference customers in the state. It did, however, respond to a suggestion received during the comment period that it allocate both units at Denison to its ERCOT Texas customers. 45 Fed.Reg. 19,032, at 19,036 (1980). This reduced the total power available to the SWPA network by 35 MW out of a total of approximately 2,000 MW.

On March 24, 1980, SWPA published its Final Power Allocations, 45 Fed.Reg. 19,-032 (1980), and sent a copy of the final

---

**3.** The environmental assessment advised:

Section 5 of the Flood Control Act requires SWPA to seek the most widespread use of hydroelectric power....

SWPA is limited to some extent in implementing this criteria due to the electrical isolation of some systems in Texas. SWPA has two hydroelectric projects which are connected to the electric utility systems which operate as part of the Electric Reliability Council of Texas (ERCOT). Since the ERCOT systems are not interconnected with utilities outside of the state of Texas, it is impossible for SWPA

to allocate capacity from resources other than these two hydroelectric projects to preference customers in the ERCOT portion of Texas. At the present time, capacity of the Whitney hydroelectric project must be sold in Texas. The capacity of the Denison hydroelectric project can be marketed either within or outside of Texas. *This 70,000 kW of generation at Denison represents the only flexibility SWPA presently has in allocating power between Texas and the other states in our marketing area.* 44 Fed.Reg. at 45,473 (1979) (emphasis added).

allocations to every customer, including Brazos. Brazos was allotted the same amount of capacity power as it then was receiving. Brazos received the notice and remained silent. SWPA also determined to provide any additional power that might become available to those preference customers who requested it. No such power has yet become available to the ERCOT Texas area.

Two preference entities, Tex-La Electric Cooperative of Texas, Inc., and Rayburn Country Electric Cooperative, Inc. received an allocation from Denison North. Also, in return for their assumption of SWPA's obligation to firm Brazos' Whitney power with Denison North output, SWPA agreed to sell them 70% of any excess energy generated at Whitney. This agreement was ultimately memorialized in a contract executed in 1984. Because Tex-La and Rayburn do not own transmission lines, they contracted with TUEC for transmission, scheduling, and firming of the power purchased from SWPA. In return for these services TUEC received 5% of the energy handled.

In March of 1983, three years after the Final Power Allocations were published, Brazos requested additional allocations. SWPA rejected these as untimely. Brazos then brought suit, challenging SWPA's 1984 contract with Tex-La and Rayburn Country, and their scheduling agreement with TUEC, contending that the contracts had not been duly noticed and that power was being sold to TUEC, a non-preference utility, in violation of the Flood Control Act of 1944. The district court granted summary judgment in favor of SWPA. Brazos appeals, assigning the errors noted.

### Analysis

#### Adequacy of Notice

■ Brazos challenges SWPA's adequacy of notice in promulgating the power allocations, contending that it was misled into believing the existing allocation scheme would be preserved and that it had no chance of getting additional power from Denison.

The Administrative Procedure Act requires the publication of notice of proposed rulemaking, including "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). In addition, SWPA was bound by the Department of Energy Organization Act to give notice "by publication of such proposed rule, regulation, or order in the Federal Register." 42 U.S.C. § 7191(b)(1).

We deem SWPA's notice adequate under both statutes. The Preliminary Power Allocations put Brazos and all other interested parties on notice that SWPA intended to reallocate system power within the six-state marketing area:

> [SWPA] will experience the termination of a number of firm and peaking power sales contracts in the future and will also have available a limited quantity of new hydro capacity from two multi-purpose reservoir projects under construction to be operative in 1980 to 1982. It is imperative that allocation and/or reallocation of this power be developed soon in order that the most equitable distribution to present and new preference customers in the six-state marketing area can be made for the period through 1988. Accordingly, the attached preliminary capacity allocation has been developed which will form the basis for developing final power allocations before the end of this calendar year.

44 Fed.Reg. at 45,469 (1979). The environmental assessment included with the notice specifically referred to the flexibility of Denison Dam and ERCOT Texas. For reasons best known to Brazos, it made no effort to inform SWPA of its view of how to accomplish "the most equitable distribution to present and new preference customers in the six-state marketing area."

■ Brazos further contends that the Final Power Allocations could not be adopted without additional notice and comment procedures. We do not agree. To require in each case a new notice and a new round of comments after revision of a proposed rule would unduly burden and delay the rulemaking process. An agency "need not sub-

ject every incremental change in its conclusions after each round of notice and comment to further public scrutiny before final action." *Weyerhaeuser v. Costle,* 590 F.2d 1011, 1031 (D.C.Cir.1978).

We have held that under the APA the original notice will be deemed sufficient if the final rule is a "logical outgrowth" of the published provisions. *Taylor Diving & Salvage Co. v. Department of Labor,* 599 F.2d 622, 626 (5th Cir.1979). This concept has been recognized in at least six other circuits. *See California v. Block,* 690 F.2d 753 (9th Cir.1983) (standard for supplemental draft EIS under NEPA); *American Paper Institute v. EPA,* 660 F.2d 954 (4th Cir.1981); *Sierra Club v. Costle,* 657 F.2d 298, 352 (D.C.Cir.1981) (under Clean Air Act); *United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980) (APA); *BASF Wyandotte Corp. v. Costle,* 598 F.2d 637 (1st Cir.1979). Other circuits inquire "whether [the notice] would fairly apprise interested persons of the 'subjects and issues' before the agency." *American Iron and Steel Institute v. EPA,* 568 F.2d 284 (3d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *National Black Media Coalition v. FCC,* 791 F.2d 1016 (2d Cir.1986); *see also Chrysler Corp. v. DOT,* 515 F.2d 1053, 1061 (6th Cir.1975) (final rule adopted is valid if it "did not embrace any major subjects that were not described in the notice of proposed rulemaking").

 We are persuaded that the final order of allocation was an obvious logical outgrowth of the published preliminary order. It dealt with the power available for allocation to preference customers in SWPA's area of responsibility. That Bra-

zos might have been surprised or disappointed by a particular allocation provides no basis for claiming a statutorily deficient notice of rulemaking.[4]

*Flood Control Act—Widespread Use Clause*

 Brazos next challenges the final allocation under the Flood Control Act of 1944. The Administrative Procedure Act provides that judicial review of an administrative decision is precluded where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Availability of judicial review, however, is the rule and nonreviewability is a narrow exception that must clearly be demonstrated. *City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). Only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply' " is judicial review precluded. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136, 150 (1971). But if a statute confers such uninhibited discretion that no issues capable of judicial resolution are presented, then the courts are without jurisdiction to consider them. *Greenwood Utilities Comm'n v. Hodel,* 764 F.2d 1459 (11th Cir.1985); *City of Santa Clara.* Courts may not review such acts even for an abuse of discretion. *See Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714, 723 (1985) ("if no judicially manageable standards are available for judging how and when an agency should exercise its discretion then it

---

4. Brazos' complaint that there should have been formal, published notice before SWPA executed its marketing contract with Tex-La and Rayburn Country is likewise without merit. Brazos maintains that it was entitled to advance notice of the sale of excess Whitney energy because it historically received that energy. This confuses the sale of power with a comprehensive scheme for its allocation.

Historically, SWPA sold all hydroelectricity to its customers on an *ad hoc* basis. When it proposed a formal program to guide future sales of capacity, SWPA was bound to follow rulemaking procedures. Believing that the un-

dependability of excess energy made it impractical to plan for such sales in the allocation scheme, it determined to continue sales of that power on an *ad hoc* basis, and formally to allot only capacity. *See* 45 Fed.Reg. at 19,035 (1980). We conclude that SWPA's policy is reasonable and therefore sales of excess energy are not rulemaking procedures and do not require rulemaking notice. 5 U.S.C. §§ 551, 553; 42 U.S.C. § 7191. Brazos has neither a contractual right to purchase excess energy produced by Whitney, nor a statutory right to prior notice of its marketing.

is impossible to evaluate agency action for 'abuse of discretion.' ").

The Flood Control Act authorizes SWPA to "transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof." 16 U.S.C. § 825s. We agree with the district court that the "widespread use" clause provides no meaningful standard by which to judge the propriety of SWPA's actions. *See ElectriCities of North Carolina, Inc. v. Southeastern Power Admin.*, 774 F.2d 1262 (4th Cir.1985). In so concluding, we join our colleagues of the Fourth, Ninth, and Eleventh Circuits. *ElectriCities; City of Santa Clara; Greenwood Utilities.* Congress gave neither direction nor limitation as to how energy is to be allocated to achieve "the most widespread use;" that matter was referred to the sound discretion of the agency. This clause "breathe[s] discretion at every pore ... permit[ting] the exercise of the widest administrative discretion by the [agency]." *City of Santa Clara*, 572 F.2d at 668.

*Flood Control Act—Preference Clause*

The Flood Control Act's preference clause limits the sale of power and energy to public bodies and cooperatives. Brazos forcefully maintains that the sale of power to Tex-La and Rayburn Country violates the preference clause because TUEC, an investor-owned utility, receives power otherwise available only to preference customers. SWPA resists review, asking that we affirm the district court's conclusion that the preference clause is discretionary and, like the widespread use clause, is so broad that no review is possible. We disagree with SWPA and the district court. Application of the clearly defined preference clause is a matter of law, not discretion. As such we must fully review it.

TUEC is the scheduling agent for the two rural cooperatives. Under its contract, TUEC receives, "for the account of the cooperatives, all hydroelectric power and associated energy," for transmission, scheduling, and firming. For providing these services it receives 5% of the energy handled. This type of scheduling arrangement has long been used by those preference customers without transmission lines, and has been authorized by SWPA, which has found it consistent with the provisions of the Flood Control Act. We agree. The allowance to TUEC of a reasonable portion of the energy handled as compensation for its transmission, scheduling, and firming services, is not a prohibited sale of power to a non-preference customer.

We underscore, however, that the value of the power given as a *quid pro quo* for services must be reasonable and consistent with the value of the services rendered the preference customer. Otherwise, the transfer would violate the preference clause. On the record before us it is readily apparent that SWPA did not sell hydroelectricity to a non-preference customer.[5] We cannot help but observe that TUEC had the only transmission lines connected to the Denison unit. Had Brazos received this allocation it would have been required to contract with TUEC to transmit the energy to its lines some distance away.

*Antitrust Review*

Brazos argues that SWPA's 1984 contract with Tex-La and Rayburn Country should be voided because SWPA failed to conduct an antitrust review. We find no basis whatever in the Flood Control Act of 1944, or any subsequent legislation, for the proposition that SWPA must conduct an antitrust review before executing contracts for the sale of power.

Finally, we find no merit in Brazos' contention that SWPA had a statutory obligation to consider its belated application for power and its objection to the contract with Tex-La and Rayburn Country. We perceive no basis whatever for faulting the conduct of SWPA in this entire proceeding.

5. We underscore that the Flood Control Act applies to all power generated at federal dams, whether considered threshold capacity or excess power. The requirement of sale to preference entities and the directive relative to widespread use apply equally to regular capacity and excess power produced.

For these reasons, the judgment of the district court is AFFIRMED.